**United States District Court**
For the Northern District of California

1

2

3                IN THE UNITED STATES DISTRICT COURT

4              FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6  ISAAC ADETAYO GRILLO, M.D.,                    No. C 05-2559 SBA

7            Plaintiff,                           **ORDER**

8     v.                                          [Docket No. 25]

9  STATE OF CALIFORNIA, et al.,

10          Defendants.
                                              /
11

12        This matter comes before the Court on defendant California Department of Corrections' ("CDC")

13  Motion to Dismiss the Amended Complaint [Docket No. 25].  Having read and considered the

14  arguments presented by the parties in the papers submitted to the Court, the Court finds this matter

15  appropriate for resolution without a hearing.  The Court hereby GRANTS the CDC's Motion to Dismiss

16  the Amended Complaint [Docket No. 25].

17                           **BACKGROUND**

18  **A.    Factual Background.**[1]

19        Plaintiff Isaac Adetayo Grillo ("Plaintiff" or "Dr. Grillo") is a medical doctor originally from

20  Nigeria, Africa.  FAC at ¶ 4.  Dr. Grillo received his M.D. from Kansas University in 1960 and

21  subsequently completed his residency at the Jewish Hospital in Kansas City.  *Id.*  From 1965 through

22  1966, Dr. Grillo trained in thoracic surgery.  *Id.* at ¶ 5.  He later moved to California and became one

23  of the first thoracic surgeons at Highland Hospital, Oakland.  *Id.*  Dr. Grillo took and passed, in his first

24  attempt, the General Surgery Board Exams in 1966 and the Thoracic Surgery Board Exams in 1967.

25  *Id.*  From 1967 to 1968, Dr. Grillo worked as a physician at the San Leandro Tuberculosis hospital while

26  teaching thoracic surgery to residents at Highland Hospital.  *Id.*

27  _____

28        [1]Except as otherwise noted, the following facts are taken from Plaintiff's First Amended
    Complaint.

**United States District Court**
For the Northern District of California

1    In 1968, Dr. Grillo moved back to Nigeria. *Id.* at ¶ 6.  For approximately twenty years, from

2  1968 to 1988, he was, successively, a lecturer, professor, and Head of the Department of Surgery at the

3  only medical school with the University of Ibadan, in Ibadan, Nigeria. *Id.*  During this time, he was the

4  only thoracic surgeon in Nigeria. *Id.*  He was also on the team that performed the first open heart

5  surgery in Africa. *Id.*  In 1988, Dr. Grillo moved from Nigeria to Saudi Arabia and was appointed

6  professor of surgery at King Saud Hospital in Abha, Saudi Arabia. *Id.*

7    In 1999, at the age of seventy, Dr. Grillo left Saudi Arabia and returned to the United States.

8  *Id.* at ¶ 7.  Dr. Grillo applied for, and was appointed to, a position as a physician for the California

9  Department of Corrections ("CDC") at the Salinas Valley State Prison, Soledad, in Monterey County,

10  California. *Id.*  He was the first black doctor to hold this position. *Id.*  Dr. Grillo commenced

11  employment with the CDC in January 2000. *Id.*

12    While employed by the CDC, Dr. Grillo was regularly chastised by the hospital's chief for

13  prescribing too many tests. *Id.* at ¶ 18.  Additionally, prison officials frequently expressed their

14  disapproval when Dr. Grillo would order an x-ray to determine whether a patient had an internal

15  fracture. *Id.*  Prison officials complained to Dr. Grillo that the tests and referrals he prescribed were

16  costing the CDC "money they could not afford." *Id.*  Prison officials also told Dr. Grillo that prisoners

17  did not deserve sophisticated medical care. *Id.*  Dr. Grillo believes that the CDC "targeted" him because

18  of his race and because of his practice of referring patients to specialists for diagnostic tests, MRIs, x-

19  rays, and laboratory tests. *Id.* at ¶ 19.

20    On June 27, 2000, prisoner Kenneth Holcomb ("Holcomb") was injured when he was physically

21  attacked by another prisoner. *Id.* at ¶ 20.  Holcomb was initially examined by prison physician, Dr.

22  Clark. *Id.*  Dr. Clark did not x-ray Holcomb or perform any tests. *Id.*  Although Holcomb had been

23  given a neck collar, Dr. Clark removed the collar and sent Holcomb back to his cell in a wheelchair.

24  *Id.*  The next day, on June 28, 2000, Dr. Grillo learned of the incident involving Holcomb. *Id.* at ¶ 21.

25  Since the Medical Technical Assistant Abel Harrison ("Harrison") refused to bring Holcomb to Dr.

26  Grillo, Dr. Grillo visited Holcomb in his cell. *Id.* at ¶ 22.  Dr. Grillo brought a neck collar and hard

27

28                                                          2

United States District Court

For the Northern District of California

1    board with him.  *Id.*  Although it was not the usual custom of the prison to videotape examinations, the

2    custody officer videotaped Dr. Grillo's examination of Holcomb.  *Id.*

3         During Dr. Grillo's examination of Holcomb, Holcomb complained that he could not feel

4    anything below his neck, suggesting that he was suffering from a spinal injury.  *Id.* at ¶ 23.  Dr. Grillo

5    also noted that Holcomb had priapism, a prolonged erection of the penis, which was indicative of a

6    spinal injury.  *Id.*  However, Holcomb's blood pressure and pulse were normal.  *Id.*  His oxygen

7    saturation was also at an acceptable level.  *Id.*  Further, although Holcomb was not able to breath using

8    his lungs, his abdominal breathing was normal.  *Id.*  Because Holcomb stated that he could not feel

9    anything below his neck, but also stated that he felt cold, Dr. Grillo suspected that Holcomb had

10   Munchausen syndrome[2] and was therefore faking his injuries.  *Id.*

11        After his initial examination of Holcomb, Dr. Grillo called Dr. Daniel Thor ("Dr. Thor"), the

12   chief physician, for a second opinion.  *Id.* at ¶ 24.  Dr. Thor arrived approximately forty-five minutes

13   later.  *Id.*  During this time, Dr. Grillo did not have access to Dr. Clark's notes because Dr. Clark's notes

14   were in the possession of Dr. Thor.  *Id.*  While waiting for Dr. Thor, Dr. Grillo decided that he would

15   test whether Holcomb was malingering paralysis.  *Id.* at ¶ 25.  Dr. Grillo therefore told Holcomb that

16   he would inject something into his arm that would make his arm move.  *Id.* at ¶ 25.  In reality, Dr. Grillo

17   only injected 2 cc of saline solution, a placebo, into Holcomb's arm.  *Id.*  Holcomb's arm moved,

18   indicating to Dr. Grillo that Holcomb was malingering.  *Id.*  When Dr. Thor arrived, Dr. Grillo received

19   Dr. Clark's notes.  *Id.* at ¶ 26.  Dr. Thor reviewed Dr. Grillo's diagnosis and signed "Agreed" on the

20   charts.  *Id.*

21        Shortly thereafter, Dr. Grillo ordered an x-ray of Holcomb's cervical spine.  *Id.* at ¶ 27.  The x-

22   ray revealed that the patient had an anterior dislocation of vertebrae C5/C6, which indicated that

23   Holcomb had suffered a serious spinal injury.  *Id.*  It was determined that Holcomb was irreparably

24

25

26        [2]Patients with Munchausen syndrome "go from medical provider to medical provider
     dramatically presenting very plausible symptoms and histories and receiving care, up to and including
27   surgery."  *Id.* at ¶ 10, n. 1.  "They fake physical signs of illness and abnormal laboratory findings."  *Id.*

28                                                3

1 damaged by the beating from the fellow inmate. *Id.* at ¶ 28. The damage had been done before any

2 physician could do anything. *Id.* Dr. Grillo and Dr. Clark were immediately and summarily suspended.

3 *Id.* at ¶ 30. Dr. Grillo remained suspended for nearly two years. *Id.* at ¶ 31. During this time, he

4 engaged in adversarial proceedings with the CDC relating to the suspension of his employment. *Id.* Dr.

5 Grillo also filed a charge with the EEOC alleging race discrimination and wrongful suspension. *Id.*

6

7 In 2001, the California Medical Board ("CMB") initiated an administrative action against Dr.

8 Grillo. *Id.* at ¶ 33. In the CMB proceedings, Dr. Grillo was accused of giving Holcomb a saline

9 solution for no apparent reason while at the same time telling the patient that he was giving him a

10 "powerful medication to make him stronger." *Id.* at ¶ 34.

11 On June 7, 2002, Dr. Grillo, on one hand, and the State and the CDC, on the other, entered into

12 a settlement agreement (the "June 2002 Settlement Agreement"). *Id.* at ¶ 32. Dr. Grillo acknowledged

13 in the June 2002 Settlement Agreement that it was entered into freely and voluntarily by and with the

14 advice of counsel. *Id.* Pursuant to the June 2002 Settlement Agreement, Dr. Grillo agreed to release

15 and dismiss all claims *of any type* against the State and the CDC, including but not limited to claims

16 under the Fair Employment and Housing Act, Title VII, and the Age Discrimination in Employment

17 Act. *Id.* Dr. Grillo also agreed not to file *any claims relating to* the allegations set forth in his original

18 and/or amended action against the CDC. *Id.* Additionally, Dr. Grillo waived the benefits of California

19 Civil Code § 1542, which provides that "[a] general release does not extend to claims which the creditor

20 does not know or suspect to exist in his favor at the time of executing the release, which if known by

21 him must have materially affected his settlement with the debtor." *Id.*

22 Although Dr. Grillo believed that the CMB's action against him would be terminated as a result

23 of the June 2002 Settlement Agreement, it was not. *Id.* at ¶ 33.

24 Dr. Grillo was subsequently required by the State of California, and, specifically, the CMB, to

25 participate in the Physician Assessment and Clinical Education ("PACE") program. *Id.* at 36; *see* CMB

26 Sept. 6, 2005 Reply at Ex. B (Nov. 24, 2004 Supp. Accusation and Petition at Ex. 1 (Stip. Settlement

27

28

4

United States District Court

For the Northern District of California

1    and Disciplinary Order)).[3]    The PACE program is a for-profit program run by defendant William

2    Norcross, M.D. ("Dr. Norcross") and administered by a private, unaccredited group of physicians in San

3    Diego who are predominately white. *Id.* at ¶¶ 36, 39.  The primary purpose of the program is the

4    evaluation of physicians with substance abuse problems or mental illness. *Id.* at ¶ 39.  The PACE

5    program takes place over two days, and is intended to evaluate the physician's skills. *Id.* at ¶ 37.

6    Among the factors evaluated in the PACE program are: (1) an assessment of clinical knowledge; (2) a

7    chart review; (3) ethics; (4) communication; (5) mechanisms of disease; (6) interpretation of medical

8    literature; and (7) an exam specific to the participant's field. *Id.*  The PACE program also requires a

9    computer test and the performance of a complete history and physical examination of the physician,

10   including neurocognitive and psychological screening. *Id.*  The PACE program charges participants

11   $5,000 for the two-day exam and another $4,500 for the second part of the exam. *Id.* at ¶ 39.  No

12   curriculum is provided to the participants and there are no text books, test materials, or manuals to assist

13   them with preparation for the course. *Id.* at 38.  The PACE evaluation is, for the most part, subjective

14   as there are no standards or metrics indicating the physician's proficiency in medicine. *Id.*  At the end

15   of the program, a participant is rated as "Pass," "Fail," or "More Training Needed." *Id.* at ¶ 39.  At the

16   time Dr. Grillo participated in the program, it had only been in existence for a few years and had been

17   never been administered to a large sample of test-takers. *Id.* at ¶¶ 38-39.

18       Dr. Grillo participated in the program during two days in May 2004 and a week in September

19   2004. *Id.* at ¶ 43.  He paid approximately $9,500 in fees. *Id.*  Based on Dr. Grillo's performance in the

20   PACE program, Dr. Norcross provided the CMB with a declaration indicating that "Dr. Grillo was slow

21

22       [3]The November 24, 2004 Stipulated Settlement and Disciplinary Order (the "CMB Stipulated
     Settlement") was filed as an attachment to the CMB's September 6, 2005 reply brief, which itself was
23   filed in connection with the CMB's prior motion to dismiss.  Because the CMB Stipulated Settlement
     was a "matter of public record" in the CMB's administrative proceedings, the Court took judicial notice
24   of the document in its previous Order.  Since this document is now officially part of the record in this
     matter as well as part of the public record in the administrative proceedings before the CMB, and since
25   this document's authenticity has not been questioned by Plaintiff and Plaintiff's First Amended
     Complaint necessarily relies on it, the Court hereby takes judicial notice of the CMB Stipulated
26   Settlement again on the instant Motion to Dismiss. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689
     (9th Cir. 2001).

27

28                                                        5

**United States District Court**
For the Northern District of California

1   and cautious, sacrificing speed for accuracy, although both scores were still within normal limits." *Id.*

2   at ¶¶ 40, 41.  Dr. Norcross further noted that Dr. Grillo's scores were "consistently low across the

3   board," that "Dr. Grillo did display an area of strength in anatomic structures and relative strength in

4   pathology and laboratory medicine," that "Dr. Grillo employed good judgment in implementing that

5   knowledge," and that "[w]hile everyone agreed that Dr. Grillo's strength is his pleasant, caring manner,

6   there was genuine concern expressed." *Id.* at ¶¶ 42,43.  Dr. Norcross further observed that Dr. Grillo

7   had indicated that he was not computer literate and that "[c]omputer literacy is a factor in this

8   examination." *Id.*

9           On October 4, 2004, based on Dr. Norcross' declaration, the CMB suspended Dr. Grillo's license

10  to practice medicine.  *Id.* at ¶¶ 40, 46.  On October 6, 2004, the CMB issued a press release stating the

11  following:

12          The Medical Board has filed an accusation against Grillo alleging
            unprofessional conduct through gross negligence and incompetence in that he
13          failed to diagnose a cervical spine injury of a prisoner at Soledad prison who
            had suffered a subluxation of C4-C5, resulting in quadraplegia.  The board later
14          adopted a stipulated settlement and disciplinary order, which imposed a public
            letter of reprimand with a condition precedent: successful completion of Phases
15          I and II of the Physician Assessment and Clinical Education (PACE) program
            at the University of California at San Diego.
16
            In a September 8, 2004 communication to the board from the Director and
17          Associate Director of the UCSD Pace Program, the board was fully informed
            that serious deficiencies were noted during Grillo's assessment by the PACE
18          faculty/staff.  The assessment report noted that at a multi-disciplinary staff
            meeting on September 1, 2004, the director and other participants 'expressed
19          grave reservations about whether Dr. Grillo should be practicing medicine' and
            that the 'deficiencies documented during his two-day Phase-1 PACE
20          Assessment, if applied in the real world of medical practice, would almost
            certainly have resulted in patient harm, and perhaps even death.'  The report
21          also stated that Grillo's serious deficiencies of clinical knowledge and judgment
            extended beyond the limited scope of the PACE Program's five-day clinical
22          education and that as a result, 'may require additional training or monitoring
            either in residency, fellowship, or some other proctored environment.'
23
24  *Id.* at ¶ 48.

    **B.      Procedural History.**
25
26          On June 22, 2005, Plaintiff filed a Complaint against the State of California (the "State"), the

27  CDC, the CMB, and Dr. Norcross alleging the following causes of action: (1) "injunctive relief" to

28                                                        6

United States District Court

For the Northern District of California

1   enforce the June 7, 2002 settlement agreement and for reinstatement of his job and license[4]; (2)

2   violations of 42 U.S.C. §§ 1983, 1985, 1986, and 1988; (3) wrongful termination in violation of public

3   policy; (4) "conspiracy to deprive civil rights"; (5) defamation; (6) infliction of emotional distress; (7)

4   tortious interference with existing and prospective business; and (8) fraud.

5        On July 12, 2005, the State and the CDC filed a Motion to Dismiss the Complaint.  On August

6   15, 2005, the CMB filed a Motion to Dismiss the Complaint.

7        On September 22, 2005, this Court granted the CMB's Motion to Dismiss and dismissed all of

8   Plaintiff's claims against CMB with prejudice.  The Court also granted the State and CDC's Motion to

9   Dismiss and dismissed Plaintiff's claims under 42 U.S.C. §§  1983, 1985, 1986, 1988, and Plaintiff's

10  state law claims, with prejudice.  Plaintiff was given leave to file an amended complaint against the

11  State and CDC as long as he could allege, in *good faith*, facts sufficient to show: (1) that he had a

12  cognizable federal cause of action against the State and CDC that was not barred by the Eleventh

13  Amendment; and (2) that the causes of action asserted against the State and the CDC were not

14  knowingly and voluntarily released and/or waived as part of the June 2002 Settlement Agreement with

15  the CDC.  Plaintiff was instructed to file his amended complaint no later than October 22, 2005.

16       On October 22, 2005, Plaintiff failed to file an amended complaint.  Accordingly, on October

17  28, 2005, this Court dismissed Plaintiff's case with prejudice.  Later that same day, Plaintiff filed a

18  Motion to Withdraw Order Dismissing the Case.  On November 7, 2005, Plaintiff filed a Motion for

19  Leave to File a Belated First Amended Complaint and Motion for Relief from Judgment Under Rules

20  59(e) and 60.  In his Motion for Leave to File a Belated First Amended Complaint, Plaintiff's counsel

21  claimed that he had failed to file an amended complaint by the required deadline due to scheduling

22  difficulties with his client.

23       On November 22, 2005, this Court granted Plaintiff's Motion for Leave to File a Belated First

24  Amended Complaint.  Plaintiff subsequently filed his First Amended Complaint on November 28, 2005.

25

26       [4]Plaintiff's first cause of action did not actually state a cognizable claim, but merely sought
    certain equitable relief that Plaintiff alleged he would be entitled to if he were to prevail on his other
27  causes of action.

28                                              7

1      The First Amended Complaint asserts the following causes of action against the CDC and Dr.

2 Norcross: (1) violation of Title VI of the Civil Rights Act of 1964 (against the CDC only); (2) unlawful

3 retaliation in violation of 28 C.F.R. § 551.90 (against the CDC only); (3) unlawful retaliation in

4 violation of the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.* (against the CDC

5 only); (4) violation of Title VII of the Civil Rights Act of 1964 (against the CDC only); (5) violation

6 of 42 U.S.C. § 1981 (against the CDC only); (6) wrongful termination in violation of public policy

7 (against the CDC only); (7) civil conspiracy (against Dr. Norcross only); and (8) defamation (against

8 Dr. Norcross only).

9      On December 12, 2005, the CDC filed the instant Motion to Dismiss Amended Complaint.[5]

10                                              **LEGAL STANDARD**

11 **A.     Federal Rule of Civil Procedure 12(b)(6).**

12      Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if it

13 appears beyond a reasonable doubt that the plaintiff "can prove no set of facts in support of his claim

14 which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  For purposes of such

15 a motion, the complaint is construed in the light most favorable to the plaintiff and all properly pleaded

16 factual allegations are taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Everest &*

17 *Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir. 1994).  All reasonable

18 inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft*, 105 F.3d 1288, 1296

19 (9th Cir. 1997).

20      In deciding a motion to dismiss under 12(b)(6), the court may consider documents "whose

21 contents are alleged in a complaint and whose authenticity no party questions, but which are not

22 physically attached to the [plaintiff's] pleading" as well as documents crucial to the plaintiff's claims,

23 but not explicitly incorporated in his complaint. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994);

24

25

26      [5]The Court notes that there is no proof of service filed with the Court indicating that Dr.
Norcross has been served with the First Amended Complaint.  The Court further notes that Dr. Norcross
has neither joined in the instant Motion to Dismiss nor filed a responsive pleading or motion of his own.

27

*United States District Court*
For the Northern District of California

1 *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).  When a plaintiff's claims are predicated upon

2 a document, and the document has not been attached to the complaint, the defendant may attach the

3 document to his Rule 12(b)(6) motion, even if the plaintiff's complaint does not explicitly refer to it.

4 *Id.*

5      The court does not accept as true unreasonable inferences or conclusory allegations cast in the

6 form of factual allegations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *See*

7 *Miranda v. Clark County, Nev.*, 279 F.3d 1102, 1106 (9th Cir. 2002) ("[C]onclusory allegations of law

8 and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); *Sprewell*

9 *v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *McGlinchy v. Shell Chem Co.*, 845 F.2d

10 802, 810 (9th Cir. 1988) ("[C]onclusory allegations without more are insufficient to defeat a motion to

11 dismiss for failure to state a claim.").   Further, the court "need not accept as true allegations that

12 contradict facts which may be judicially noticed." *Mullis v. United States Bankruptcy Ct.*, 828 F.2d

13 1385, 1388 (9th Cir. 1987), *cert denied,* 486 U.S. 1040 (1988).

14      When a complaint is dismissed for failure to state a claim, "leave to amend should be granted

15 unless the court determines that the allegation of other facts consistent with the challenged pleading

16 could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d

17 1393, 1401 (9th Cir. 1986).  The Court should consider factors such as "the presence or absence of

18 undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

19 undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

20 *Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).  Of these factors, prejudice to the opposing party

21 is the most important.  *See Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) (citing

22 *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971)).   Leave to amend is

23 properly denied "where the amendment would be futile." *DeSoto v. Yellow Freight Sys.*, *Inc.*, 957 F.2d

24 655, 658 (9th Cir. 1992).

25                                    **ANALYSIS**

26      In the CDC's Motion to Dismiss, the CDC argues that all of Plaintiff's claims against it must be

27 dismissed with prejudice for the following reasons: (1) all of Plaintiff's claims are barred by the June

28                                         9

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1   2002 Settlement Agreement and Plaintiff has failed to allege any facts sufficient to show that the June

2   2002 Settlement Agreement was not a valid release of those claims; (2) Plaintiff's second cause of action

3   for alleged violations of 28 C.F.R. § 551.90 is frivolous because 28 C.F.R. § 551.90 is not applicable

4   to the instant action; (3) Plaintiff's third cause of action for alleged violations of 42 U.S.C. § 1997 is

5   frivolous because Plaintiff is not an incarcerated person and because the statute does not provide for a

6   private right of action; (4) Plaintiff's fifth cause of action for alleged violations of 42 U.S.C. § 1981 fails

7   to state a claim; (5) Plaintiff's second, third, and fifth causes of action are barred by the Eleventh

8   Amendment; and (6) Plaintiff's sixth cause of action is barred by Plaintiff's failure to satisfy the

9   requirements of the California Tort Claims Act.[6]

10          The CDC's arguments are meritorious.  In this Court's September 22, 2005 Order dismissing

11  Plaintiff's initial complaint, the Court granted Plaintiff leave to amend "*only if* [he could] allege, in *good*

12  *faith,* facts sufficient to show that: (1) he has a cognizable federal cause of action against . . . the

13  California Department of Corrections that is not barred by the Eleventh Amendment; and (2) he has not

14  knowingly and voluntarily waived his right to assert the claims against the State and the California

15  Department of Corrections."  *See* Sept. 22, 2005 Order.  This directive was prompted by the Court's

16  concern that Plaintiff's initial complaint was premised on causes of action that were clearly barred by

17  the Eleventh Amendment and which had been previously asserted against the CDC, but knowingly and

18  voluntarily released by Plaintiff more than three years ago.  As set forth in greater detail below,

19  Plaintiff's Amended Complaint utterly fails to address or rectify the Court's concerns.

20

21          [6]The CDC also argues that Plaintiff's first cause of action for alleged violations of Title VI of
22  the Civil Rights Act of 1964 fails to state a claim because Plaintiff has not alleged that the CDC received
    federal funds or that a primary objective of those funds was to provide employment.  Title VI provides
23  in relevant part that "[n]o person in the United States shall, on the ground of race, color, or national
    origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination
24  under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The Ninth
    Circuit addressed the pleading requirements under Title VI in *Fobbs v. Holy Cross Health System Corp.*,
25  29 F.3d 1439, 1447 (9th Cir. 1994), and held that, in order to state a claim for damages under Title VI,
    a plaintiff must allege: (1) that the entity involved engaged in racial discrimination; and (2) that the
26  entity involved is receiving federal financial assistance.  *Id.*  For the purposes of this Motion to Dismiss,
    construing the First Amended Complaint in the light most favorable to Plaintiff, it appears that Plaintiff
27  has adequately satisfied the pleading requirements for a Title VI claim.  Accordingly, the Court declines
    to grant the CDC's Motion on this basis.

28                                                                  10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**A.     Plaintiff's Knowing and Voluntarily Release of All Claims Relating to His Initial Action against the CDC**

First and foremost, Plaintiff's First Amended Complaint fails to rectify or even address the fact that all of Plaintiff's current claims against the CDC are barred by the June 2002 Settlement Agreement. Instead, Plaintiff's First Amended Complaint explicitly *reaffirms* the fact that Plaintiff freely, voluntarily, and with the advice of counsel, entered into a settlement agreement with the CDC releasing all claims of *any type* under state *or* federal law against the CDC relating to the allegations set forth in Plaintiff's original and/or amended action against the CDC.[7]   FAC at ¶32.   The First Amended Complaint also reaffirms the fact that, similar to the instant lawsuit, the initial action against the CDC was premised on allegations of race discrimination and the purportedly wrongful suspension or termination of Plaintiff's employment.  *Id.* at ¶ 31.

While Plaintiff argues in his Opposition brief that he "challenges the validity [and] enforceability . . . of that 'release,'" and that he was "duped into signing the release," there are absolutely *no* facts alleged in the First Amended Complaint that support this statement *even though Plaintiff was explicitly warned that his case against the CDC would be dismissed with prejudice unless he could provide the Court with such facts.*  In fact, the only allegation in the First Amended Complaint pertaining to the validity of the agreement – which is that the CDC purportedly breached the agreement by failing to terminate the CMB's investigation – was present in his original complaint and already found insufficient by this Court.  FAC at ¶33.[8]

---

[7]Indeed, the factual allegations contained in the First Amended Complaint are virtually identical to those alleged in his original complaint.

[8]The fact that Plaintiff asserted a cause of action in his prior Complaint seeking to *enforce* the very agreement he contends is unenforceable caused this Court considerable concern when deciding the motions to dismiss previously filed by the CMB, CDC, and the State of California. Nevertheless, due to Plaintiff's insistence that this agreement was somehow invalid, this Court granted Plaintiff leave to file an amended complaint so long as he could allege *in good faith* facts sufficient to show that the release was invalid. The First Amended Complaint that Plaintiff has filed utterly ignores this directive. The Court also finds that granting Plaintiff further leave to amend would be prejudicial to the CDC. The CDC has already expended its resources in moving to dismiss Plaintiff's complaints on two separate occasions and should not have to expend additional resources merely because Plaintiff has not been able to follow the Court's explicit instructions. *See Moore*, 885 F.2d at 538 (holding that dismissal with prejudice is warranted when plaintiff has repeatedly failed to cure deficiencies in his amended pleadings); *see also Jackson*, 902 F.2d 1387 (holding that prejudice to opposing party is the most important factor to be considered).

**United States District Court**
For the Northern District of California

1          While Plaintiff alternatively argues that the June 2002 Settlement Agreement does not apply to

2    his current claims because his wrongful termination and discrimination claims are based on certain

3    unlawful adverse employment actions that took place *after* the agreement was signed, this argument is

4    also without merit.  First, according to the clear and unambiguous language of the release, which is set

5    forth verbatim in Plaintiff's First Amended Complaint, Plaintiff "agree[d] not to file *any* claims *relating*

6    *to* the allegations set forth in his original and/or amended action."  *See* FAC at ¶ 31 (emphasis added).

7    Second, the only cause of action in Plaintiff's First Amended Complaint that provides any specificity

8    with respect to Plaintiff's purportedly improper discharge from the CDC is his first cause of action,

9    wherein he contends that he was subjected to "unfair discrimination based on his race, age, ethnicity,

10   color or national origin when the CDC discharged Dr. Grillo based on the wrong 'test' results of the

11   PACE program."  *Id.* at ¶ 56 (emphasis in original omitted).[9]  However, not only are there no *facts*

12   alleged in the FAC that set forth the manner in which Plaintiff was discharged from the CDC, or setting

13   forth the timing of this event, but this Court has already determined that the CDC cannot be held legally

14   responsible for the actions of a completely different entity, the CMB.  And, as previously noted above,

15   the public record from the CMB's administrative proceedings make it clear that it was the *CMB*, and not

16   the CDC, that required Plaintiff to participate in PACE.  *See* CMB Sept. 6, 2005 Reply at Ex. B (Nov.

17   24, 2004 Supp. Accusation and Petition at Ex. 1 (Stip. Settlement and Disciplinary Order))

18   (memorializing Plaintiff's agreement that he would only be subjected to public reprimand so long as he

19   satisfactorily completed the PACE program).  The public record is also clear that Plaintiff agreed to this

20   condition.  *Id.*  Further, the record is clear that Plaintiff's license was revoked by the CMB after he failed

21   to pass the PACE examination.  *Id.*  As such, even if Plaintiff had set forth facts sufficient to show that

22   the CDC did not terminate his employment until 2004 and that this termination was somehow unrelated

23   to claims that were already released  – which he has not – it is highly doubtful that Plaintiff would have

24   a viable claim against the CDC for wrongful termination since Plaintiff was an unlicensed physician at

25

26          [9]This statement further elucidates the fact that Plaintiff's current claims *are* directly related to
those released in the June 2002 Settlement Agreement, as Plaintiff's First Amended Complaint is
27   premised on Plaintiff's contention that the CDC "targeted" him in the same discriminatory fashion prior
to the incident with Holcomb and, thus, prior to the time that he entered into the June 2002 Settlement
28   Agreement.

**United States District Court**
For the Northern District of California

1   this time. *See* Cal. Bus. & Prof. Code § 2052 (noting that the practice of medicine without a license is

2   an offense punishable by imprisonment).

3         Because Plaintiff has failed to satisfy the Court's explicit mandate that he set forth facts showing

4   that the June 2002 Settlement Agreement is either invalid or inapplicable, all of  Plaintiff's causes of

5   action are hereby DISMISSED WITH PREJUDICE.

6   **B.      Plaintiff's Second, Third, and Fifth Causes of Action Fail to State a Claim**

7         Additionally, the CDC is correct that Plaintiff's second cause of action, which is premised on 28

8   C.F.R. § 551.90, is patently frivolous because it is inapplicable to the instant action.  This regulation

9   provides that "Bureau staff shall not discriminate against *inmates* on the basis of race, religion, national

10  origin, sex, disability, or political belief."[10] *Id.*  Plaintiff's First Amended Complaint clearly states that

11  Plaintiff was a *physician* at the CDC, not an inmate.  Further, this regulation pertains to *federal* prisons.

12  As such, the second case of action is utterly inapplicable and is also DISMISSED WITH PREJUDICE

13  on this basis as well.

14        For similar reasons, Plaintiff's third cause of action, which is brought under 42 U.S.C. § 1997

15  *et seq.,* the Civil Rights of Institutionalized Persons Act, is frivolous and is DISMISSED WITH

16  PREJUDICE.  *See Darden v. Alameda County Network of Mental Health Clients*, 1995 WL 616633 *6

17  (N.D. Cal. 1995).  As an initial matter, given that this Court previously commented that the Civil Rights

18  of Institutionalized Persons Act was inapplicable to this action, Plaintiff's decision to nevertheless

19  include this cause of action in his First Amended Complaint is highly questionable.  Further, even if this

20  statute were applicable here, which it is not, the Fifth Circuit has expressly held that 42 U.S.C. § 1997d[11]

21  does not provide persons such as Plaintiff with a private right of action.  *Price v. Brittain*, 874 F.2d 252,

22  262-64 (5th Cir. 1989) (stating that the statute authorizes the *Attorney General* to initiate or intervene

23  in a civil action on behalf of state institutionalized persons subject to "egregarious or flagrant conditions

24  of confinement").

25

26      [10]The term "inmate" is defined as "all persons in the custody of the Federal Bureau of Prisons or Bureau contract facilities."  28 C.F.R. 550.1(c).

27

28      [11]42 U.S.C. § 1997d states that "no person reporting conditions which may constitute a violation under this subchapter shall be subjected to retaliation in any manner for so reporting." *Id.*

14

**United States District Court**
For the Northern District of California

1  Plaintiff's assertion that *Jackson v. Birmingham Bd. of Education,* 125 S. Ct. 1497 (2005) holds

2  otherwise is totally without support.  The *Jackson* opinion pertains to Title IX of the Education

3  Amendments of 1972 and does not even discuss 42 U.S.C. § 1997.  There is simply no basis for this

4  Court to extend *Jackson's* holding to the Civil Rights of Institutionalized Persons Act here, especially

5  when the facts in *Jackson* are not even remotely analogous to the instant action and, in fact, Plaintiff's

6  allegations do not even fall within the reach of the Civil Rights of Institutionalized Persons Act in the

7  first place.

8  Plaintiff has also failed to state a claim under his fifth cause of action.  In his fifth cause of

9  action, Plaintiff alleges that the CDC violated 42 U.S.C. § 1981 when it "denied him job-related benefits

10  and privileges that other employees were provided" on the basis of his race, national origin, age, and

11  color.  Section 1981 provides in pertinent part:

12  
13  
14  
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

15  42 U.S.C. § 1981.  As the CDC correctly argues, California courts have long held that state employment,

16  such as Plaintiff's employment with the CDC, is granted by statute, not by contract.  *Miller v. State of*

17  *California*, 18 Cal.3d. 808, 813 (1977).  In addition, California Constitution article VII provides in

18  section 1, subdivision (a), that "every officer and employee of the State" is in the state civil service

19  system, unless otherwise exempted by the state Constitution.  *Id.*  As such, Plaintiff's fifth cause of

20  action, which is premised on Plaintiff's assertion that he had a contractual right to certain job-related

21  benefits and privileges, does not appear to be encompassed by this provision of the Civil Rights Act.

22  Further, Plaintiff does not provide any response to the CDC's argument that this cause of action should

23  be dismissed on this basis.  Accordingly, in addition to this Court's conclusion that Plaintiff's fifth cause

24  of action is barred by the June 2002 Settlement Agreement, Plaintiff's fifth cause of action is hereby

25  DISMISSED WITHOUT PREJUDICE for failure to state a claim.

26  
27  
28

**United States District Court**
For the Northern District of California

**C.    Plaintiff's Second, Third, and Fifth Causes of Action are Barred by the Eleventh Amendment**

Additionally, the Court finds that Plaintiff's second, third, and fifth causes of action are barred by the Eleventh Amendment.  The Eleventh Amendment bars private actions brought against the state, with the limited exception of those instances where the state has consented to the suit or where Congress has expressly abrogated the state's immunity.[12]  *See Board of Trustees v. Garrett*, 531 U.S. 356, 363-64 (2001); *see also Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) ("Congress may, however, abrogate such immunity in federal court if it makes its intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment.").

Plaintiff argues that, under 42 U.S.C. § 2000d-7, the CDC waived its Eleventh Amendment sovereign immunity when it accepted certain federal grants.[13]  Section 2000d-7 provides that:

> A State shall not be immune under the Eleventh Amendment of the Constitution from suit in Federal court for a violation of section 504 of the Rehabilitation Act [29 U.S.C. § 794], title IX of the Education Amendments of 1972 [20 U.S.C §§ 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. §§ 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. §§2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7.

Since the statutes and regulations asserted in Plaintiff's second, third, and fifth causes of action are not actually listed in 42 U.S.C. § 2000d-7, the Court assumes that Plaintiff is attempting to invoke the portion of 42 U.S.C. § 2000d-7 that applies to "any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."  However, Plaintiff's claims under 28 U.S.C. § 551.90 and 42 U.S.C. § 1997 are for unlawful retaliation, not for allegedly discriminatory actions relating to the

---

[12]Specifically, the Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI.

[13]Oddly, in outlining his argument with regard to 42 U.S.C. § 2000d-7 in his Opposition, Plaintiff relies solely on the contention that Section 504 of the Rehabilitation Act of 1973 is not barred by the Eleventh Amendment. The Rehabilitation Act prohibits discrimination against persons with disabilities. *Id.* However, there are *no* allegations in the First Amended Complaint that Plaintiff had a disability or was ever discriminated against based on any purported disability. As such, the Court has disregarded these arguments.

**United States District Court**
For the Northern District of California

1   provision of federal funds.  Thus, 42 U.S.C. § 2000d-7 is not applicable.  Further, the Ninth Circuit has

2   expressly held that suits brought under 42 U.S.C. § 1981 against the State of California are barred by

3   the Eleventh Amendment.  *Peters v. Lieuallen*, 693 F.2d 966, 970 (9th Cir. 1982).

4          Thus, in addition to all of the reasons previously discussed, Plaintiff's second, third, and fifth are

5   DISMISSED WITH PREJUDICE because they are barred by the CDC's sovereign immunity.

6   **D.     Plaintiff's State Law Cause of Action is Barred for Failure to Exhaust Administrative
          Remedies**

7          Finally, in this Court's prior Order, the Court explicitly warned Plaintiff that, if he decided to

8   amend his complaint in order to assert state law causes of action against the CDC, he was required to

9   set forth specific factual allegations sufficient to show either that: (1) he complied with the claim

10  presentation requirements of the California Tort Claims Act, or (2) he did not comply with the claim

11  presentation requirements, but can demonstrate the existence of an applicable and recognized exception

12  or excuse for noncompliance.  Plaintiff has not satisfied either requirement.

13         Under California Government Code § 911.2, "[a] claim relating to a cause of action for death

14  or for injury to person or to personal property . . . shall be presented [to the public entity]. . . not later

15  than six months after the accrual of the cause of action."  *Id.*  Additionally, California Government Code

16  § 945.4 provides that "no suit for money or damages may be brought against a public entity on a cause

17  of action for which a claim is required to be presented . . . until a written claim therefor has been

18  presented to the public entity and has been acted upon by the board, or has been deemed to have been

19  rejected by the board . . . ."  Cal. Gov. Code § 945.4.  Finally, section 945.6 provides that, "any suit

20  brought against a public entity on a cause of action for which a claim is required to be presented . . .

21  must be commenced, if written notice is given in accordance with section 913, not later than six months

22  after the date such notice is personally delivered or deposited in the mail."  Cal. Gov. Code § 945.6.

23  "[T]he combined effect of sections 911.2 and 945.6 is that a claim for a personal injury action against

24  a public entity must be presented within six months of the injury; and if the claim is denied, suit must

25  be filed within six months of the date of denial."  *Schmidt v. Southern California Rapid Transit Dist.*,

26  14 Cal. App. 4th 23, 25-26 (1993).

27         A valid tort claim must state the date, place, and other circumstances of the occurrence or

28

United States District Court
For the Northern District of California

1  transaction which gave rise to the claim, a general description of the injury or damage incurred, and the

2  name or names of the public employees who caused such injury or damage.  Cal. Gov. Code § 910(c)-

3  (e).  Pursuant to California Government Code § 915(b), claims against the State must be presented to

4  the State Victim Compensation and Government Claims Board.  *See* Cal. Gov. Code § 915.

5          If a civil complaint does not affirmatively allege compliance with the claim presentation

6  requirements, or allege facts showing the applicability of a recognized exception or excuse for

7  noncompliance, it must be dismissed.  *State v. Superior Court*, 32 Cal.4th 1234, 1242-43 (2003); *Karim-*

8  *Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 627 (9th Cir. 1988).  In fact, the Ninth Circuit has

9  expressly held that compliance with California's Tort Claims Act is a substantive element of any cause

10  of action against the State.  *See U.S. v. California*, 655 F.2d 914, 918 (9th Cir. 1980).

11          Based on this Court's review of the First Amended Complaint, the Court finds that it is still

12  beyond dispute that Plaintiff has not complied with the above-noted requirements.  Specifically, the First

13  Amended Complaint does not contain any factual allegations sufficient to show that Plaintiff submitted

14  a written claim to the State Victim Compensation and Government Claims Board.  Additionally, it does

15  not contain any facts showing that Plaintiff may be excused from the claim submission requirement of

16  California's Tort Claims Act.   For these reasons alone, the sixth cause of action must be dismissed.

17  *Superior Court*, 32 Cal.4th at 1242.

18          Further, although Plaintiff contends in his Opposition that he has satisfied the California Tort

19  Claims Act because he has now filed a claim with the Victim Compensation and Government Claims

20  Board, Plaintiff fails to disclose that the Victim Compensation and Government Claims Board, in fact,

21  rejected his claim as untimely on October 20, 2005.  *See* CDC Reply at Ex. A.  Accordingly, Plaintiff's

22  sixth cause of action is also DISMISSED WITH PREJUDICE due to Plaintiff's noncompliance with the

23  California Tort Claims Act.[14]

24

25

26

27          [14]Plaintiff's argument that the California Tort Claims Act does not apply because his wrongful
    termination claim is premised on Title VII does not save this cause of action from dismissal with
    prejudice.  As set forth above, the claim is also barred due to the fact that Plaintiff knowingly and

28  voluntarily released his right to sue the CDC for wrongful termination.

**United States District Court**

For the Northern District of California

**CONCLUSION**

IT IS HEREBY ORDERED THAT defendant California Department of Corrections' Motion to Dismiss [Docket No. 25] is GRANTED.  All of Plaintiff's claims against the CDC are DISMISSED WITH PREJUDICE.  Plaintiff may NOT file another amended complaint without first seeking leave of Court and demonstrating the existence of good cause.

IT IS FURTHER ORDERED THAT Plaintiff must either serve defendant William Norcross ("Norcross") with the First Amended Complaint on or before March 21, 2006 or dismiss Norcross from the lawsuit.  The Court warns Plaintiff that, if he fails to timely serve Norcross in accordance with Federal Rule of Civil Procedure 4 by the applicable deadline, the Court will dismiss Norcross from the lawsuit without prejudice and close the case without any further notice to Plaintiff.

IT IS FURTHER ORDERED THAT since all of the federal claims have been dismissed from the lawsuit, pursuant to 28 U.S.C. § 1367(c)(3), the Court is declining to exercise supplemental jurisdiction over Plaintiff's claims against Norcross.  Thus, Plaintiff must establish that this Court has jurisdiction over Plaintiff's remaining state law claims against Norcross pursuant to 28 U.S.C. § 1332. Due to the fact that Plaintiff's First Amended Complaint is devoid of any facts or allegations showing that the amount in controversy between Plaintiff and Norcross is in excess of $75,000, Plaintiff is ORDERED TO SHOW CAUSE as to why the case against Norcross should not be dismissed for lack of diversity jurisdiction.  No later than February 28, 2006, Plaintiff shall file a brief and any necessary supporting documentation showing that this Court has subject matter jurisdiction over Plaintiff's claims against Norcross.  The brief shall be no longer than 10 pages.  Upon receipt of Plaintiff's brief, the Court will take the matter under submission.  Plaintiff is expressly warned that his obligation to respond to the Court's Order to Show Cause is **in addition to** his obligation to timely serve Norcross with the First Amended Complaint by March 21, 2006.  However, Plaintiff will be relieved of his obligation to respond to the Court's Order to Show Cause if he voluntarily dismisses his case against Norcross on or before the February 28, 2006 deadline.

IT IS FURTHER ORDERED THAT the Case Management Conference currently scheduled for **March 1, 2006 at 3:00 p.m.** is CONTINUED to **April 5, 2006 at 2:45 p.m.**  The parties shall **meet and**

19

1   **confer** prior to the conference and shall prepare a joint Case Management Conference Statement which

2   shall be filed no later than ten (10) days prior to the Case Management Conference.  Plaintiff shall be

3   responsible for filing the statement as well as for arranging the conference call.  All parties shall be on

4   the line and shall call (510) 637-3559 at the above indicated date and time.

5          IT IS SO ORDERED.

6
    Dated: 2/13/06                                 SAUNDRA BROWN ARMSTRONG
7                                                   United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20